## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRAVIS S. SWEIGART<br>1396 Geigertown Road<br>Geigertown, PA 19523 | : <br> : <br> : | |
| Plaintiff | : | CIVIL ACTION |
| v. | : | No. |
| | : | |
| TRANSFER STATION SERVICES INC.<br>451 Frelinghuysen Avenue<br>Newark, NJ 07114, and | : <br> : <br> : | |
| | : | **JURY TRIAL DEMANDED** |
| TRANSFER TRAILER SERVICES INC.<br>451 Frelinghuysen Avenue<br>Newark, NJ 07114, and | : <br> : <br> : | |
| | : | |
| BLUE & GREEN TRUCKING & HAIR, LLC<br>450 Park Avenue<br>Patterson, NJ 07504, and | : <br> : <br> : | |
| | : | |
| KEVIN J. PATTEN d/b/a BLUE & GREEN<br>TRUCKING & HAIR, LLC<br>450 Park Avenue<br>Patterson, NJ 07504, and | : <br> : <br> : <br> : | |
| | : | |
| COVANTA SUSTAINABLE SOLUTIONS,<br>LLC<br>445 South Street<br>Morristown, NJ 07960 | : <br> : <br> : <br> : | |
| Defendants | : | |

## COMPLAINT

### Introduction

1.      Before dawn on September 9, 2019, on Route 10 near Morgantown, Berks County,

Pennsylvania, Kevin Patten, working for non-party Voyager Trucking Corporation (VTC)[1] and for

---

[1] On January 29, 2021, plaintiff filed a complaint regarding this same incident against Mr. Patten and VTC in the Philadelphia County Court of Common Pleas.  Mr. Patten and VTC removed that matter to the United States District Court in the Eastern District of Pennsylvania, and it is now docketed at Civil Action No. 5:21-cv-00922.  This lawsuit is being brought against additional parties to the municipal waste hauling job that Mr. Patten was on at the time of the accident who

**Defendants Transfer Station Services Inc., Transfer Trailer Services Inc., and Blue & Green Trucking & Hair, LLC**, drove his 38½ ton tractor-trailer into the right of way of, and then ran over **Plaintiff, Travis Sweigart**, who was driving to work on his motorcycle.

2.      At the stop sign at the bottom of the ramp from Exit 1 southbound on I-176, Mr. Patten asserts that he saw the headlight of Mr. Sweigart's motorcycle on Route 10 approaching from Mr. Patten's left.  He stated later to the police officer on the scene that he saw the motorcycle "at the turnpike entrance" just past the I-176 overpass.

3.      There was not enough distance for Mr. Patten to pull his tractor-trailer safely across Mr. Sweigart's travel lane, but rather than wait a few seconds to allow Mr. Sweigart to pass safely, Mr. Patten began to turn left, bringing his fully-loaded, 68½ foot rig out in front of Mr. Sweigart.

4.      As Mr. Sweigart slowed down and braked, trying to avoid a collision, his motorcycle went down on its right side.  Mr. Sweigart's motorcycle then slid toward the rear of Mr. Patten's trailer, rotating 180 degrees before striking a tire of the trailer. The truck's tire folded the rear of the motorcycle seat over onto Mr. Sweigart's pelvis, crushing it.

5.      Mr. Patten also ran over Mr. Sweigart's feet and ankles with the rear tires of his 77,000-pound tractor-trailer, crushing them as well.

6.      Since the accident, over $1MM has been paid for the treatment of Mr. Sweigart's injuries, which include: a massive crush injury of the pelvis and multiple fractures of the legs, lower ribs and vertebrae; the permanent placement of a colostomy bag and urinary catheter; a neurogenic bladder; and the amputation of his right leg below the knee. The cost of Mr. Sweigart's future medical care has been projected to exceed $5.25 million.

-------------------

also are legally responsible for Mr. Patten's injuries. Plaintiff intends to seek consolidation of these two actions.

7.     It appears likely that Mr. Sweigart also will suffer an amputation of his left leg. Additionally, Mr. Sweigart has had a gaping wound above his buttocks which has not healed despite two repair surgeries.

**The Parties**

8.     Plaintiff, Travis Sweigart, resides at 1396 Geigertown Road, Geigertown, PA 19523; he is a resident and citizen of the Commonwealth of Pennsylvania.

9.     Defendant Transfer Station Services Inc. ("TSS") is a New Jersey corporation with its principal place of business located at 451 Frelinghuysen Avenue, Newark, NJ 07114.

10.     Defendant TSS owned the Incident Trailer (NJ Trailer Tag No. TRY66W).

11.     Defendant Transfer Trailer Services Inc. ("TTS") is a New Jersey corporation with its principal place of business located at 451 Frelinghuysen Avenue, Newark, NJ 07114.

12.     Defendant Blue & Green Trucking & Hair, LLC ("Blue & Green"), is the registered owner of the 2006 Freightliner Columbia tractor with sleeper cab that Mr. Patten was driving at the time of the accident. Blue & Green is a New Jersey business entity with its registered office at Mr. Patten's home address, 450 Park Avenue, Paterson, NJ 07504.

13.     In July 2013, the New Jersey Secretary of State revoked Blue & Green's certificate of incorporation for failure to file annual reports.

14.     The name "Blue & Green Trucking & Hair, LLC," has since been used in conducting an unincorporated business by Kevin Patten, as a sole proprietor.

15.     To the extent that Blue & Green is considered a dissolved corporation under New Jersey law, this lawsuit against it is procedurally permissible under N.J. Stat. Ann. § 14A:12-9(2)(e).

16.     Hereinafter, plaintiff will refer to defendants Blue & Green and Kevin J. Patten d/b/a Blue & Green Trucking & Hair, LLC, collectively as "the Blue & Green Defendants."

17.     Defendant Covanta Sustainable Solutions, LLC. (Covanta), was at the time of the accident and all relevant times a Delaware limited liability company, registered to do business in Pennsylvania, with its principal place of business located at 445 South Street, Morristown, NJ 07960.

18.     VTC, a defendant in the companion case, is a New Jersey corporation with its principal place of business located at 451 Frelinghuysen Avenue, Newark, NJ 07114.

**Jurisdiction and Venue**

19.     28 U.S.C. §1332(a)(1) confers Federal Court jurisdiction over this matter.

20.     The citizenship of plaintiff and defendants is diverse.

21.     The matter in controversy in this action exceeds $75,000.

22.     Because defendants have purposely directed their activities to this forum and because this lawsuit arises out of defendants' forum-related activities, this Court has specific jurisdiction over defendants.

23.     Defendants TSS, TTS, and the Blue & Green Defendants regularly conduct business within the Eastern District of Pennsylvania, including the delivery of municipal waste to the Conestoga Landfill located in Berks County, PA.

24.     At all times relevant hereto, defendant Covanta regularly conducted business in the Eastern District of Pennsylvania through its Master Service Agreement with VTC for the delivery of municipal waste from its transfer stations to various destinations, including the Conestoga Landfill located in Berks County, PA.

25.     The accident in question occurred within the Eastern District of Pennsylvania, on Route 10 near Morgantown, Berks County, Pennsylvania.

26.     Venue in the Eastern District of Pennsylvania is proper pursuant to 28 U.S.C. §1391(b)(2)("A civil action may be brought in… a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred….").

**Background**

27.     At the time of the accident, Mr. Patten was hauling municipal waste to the Conestoga Landfill, 420 Quarry Road, Morgantown, PA, for VTC., one of the largest waste haulage companies in the northeast, under a Master Transportation Agreement between VTC and defendant Covanta.

28.     VTC is a waste-hauling company and motor carrier, specializing in the interstate transportation of municipal and construction waste from transfer stations and manufacturing facilities to landfills and incinerators located in the northeast corridor, including in Philadelphia County.

29.     VTC is among the largest waste haulers in the tri-state region, transporting more than 1,500,000 tons of municipal and construction waste annually. As part of its business, VTC operates a fleet of approximately 200 trucks and 250 trailers which it leases or owns.

30.     At the time of the accident and at all relevant times, VTC was a licensed transporter of solid waste under rules and regulations established by the New Jersey Department of Environmental Protection (NJDEP), pursuant to New Jersey's Solid Waste Management Act (N.J.S.A. 13:1E-1 to -225) and Solid Waste Utility Control Act (N.J.S.A. 48:13A-1 to -13).

31.     Such license (termed an A-901 license) is required to engage in the transportation of solid waste in New Jersey, pursuant to N.J.A.C. 7:26-3.2; N.J.S.A. 13:1E-4; and N.J.S.A. 13:1E-126 to -135.

32.     At the time of the accident and at all relevant times, VTC operated under NJDEP A-901 License Nos. 33932 and 17093. Decals bearing these license numbers were affixed to the side of the incident trailer.

33.     At the time of the accident and at all relevant times, VTC was an authorized transporter of waste under the Pennsylvania Waste Transportation Safety Program, administered by the Pennsylvania Department of Environmental Protection (PADEP).

34.     The Waste Transportation Safety Program "[e]nsure[s] the responsible and safe transportation of municipal or residual waste to processing and disposal facilities by requiring written authorization from the department…" See 27 Pa. C.S.A. § 6203(b) & (c).

35.     At the time of the accident and at all relevant times, VTC operated under PADEP Permit No. WH0851.  A decal bearing this permit number was affixed to the side of the Incident Trailer.

36.     At the time of the accident and at all relevant times, VTC was a "for hire motor carrier" within the meaning of the Federal Motor Carrier Act (FMCA) and the Federal Motor Carrier Safety Regulations (FMCSR), pursuant to 49 C.F.R. §, 390.5.

37.     At the time of the accident and at all relevant times, VTC operated under USDOT No. 634411.

38.     At the time of the accident and at all relevant times, VTC was an "employer" within the meaning of the FMCA and the FMCSR, pursuant to 49 U.S.C.A. §31132(3), 49 C.F.R. §390.5.

39.     At the time of the accident and at all relevant times, Kevin Patten was an "employee" within the meaning of the FMCA and the FMCSR, pursuant to 49 U.S.C.A. §31132(2), 49 C.F.R. §390.5.

40.     At the time of the accident and at all relevant times, VTC was the statutory employer of Mr. Patten within the meaning of the FMCA and FMCSR, pursuant to 49 U.S.C.A. §31132(2), (3), 49 C.F.R. §390.5.

41.     At the time of the accident and at all relevant times, VTC controlled the result of Mr. Patten's work, and had the right to direct the way his work was accomplished.

42.     At the time of the accident and at all relevant times, Kevin Patten was an employee of VTC.

43.     As described more fully below, the accident occurred during the transportation of municipal waste to the landfill pursuant to a "Master Transportation Agreement" between VTC and defendant, Covanta Sustainable Solutions, LLC ("Covanta").

44.     Defendant Covanta owns two solid waste transfer stations in New Jersey and, as described in the Master Transportation Agreement, "In the conduct of its business, Covanta needs to transport Materials (hereinafter defined) from the Transfer Stations to various destinations."

45.     At the time of the accident and at all relevant times, VTC was providing transport services to defendant Covanta, in accordance with the Master Services Agreement, hauling solid waste to Conestoga Landfill, 420 Quarry Road in Morgantown, PA.

46.     The Master Transportation Agreement provides, *inter alia*, that VTC is "engaged in the transportation business" and that VTC was engaged to "provide transportation services to Covanta."

47.     The Agreement additionally provides that VTC "shall furnish all qualified personnel, relevant expertise, appropriate supervision, sufficient tractors, trailers and other equipment and materials, and all licenses, permits and approvals required by Law, which are necessary to provide the transportation services…."

48.     The Agreement additionally provides that VTC "is engaged in the transportation business, has developed the requisite expertise for performing that work, has adequate resources and equipment in good working order together with fully trained and experienced personnel capable of performing the Services in a good and professional manner and in accordance with this Agreement and exhibits the standard of care and skill normally exercised by professional contractors performing the same type of services."

49.     The Agreement additionally provides that "[a]ll machinery and equipment used by [VTC] in the performance of the Services has been properly maintained and is in good working order for the purposes of ongoing operation, and all personnel operating such machinery and equipment are qualified and suited for the Services to be performed."

50.     The Agreement additionally provides that VTC "shall be responsible and accountable for safety at all times during the performance of the Services under this Agreement."

51.     The Agreement additionally provides that VTC "shall comply with all Laws relating to the Services…."

52.     The Agreement additionally provides that VTC "shall not subcontract the performance of any the Services to another carrier without the prior written consent of Covanta."

53.     The Agreement additionally provides that VTC "shall (and shall cause all approved Subcontracted motor carriers) (i) hold motor carrier authority issued or recognized by the U.S. Department of Transportation…and (iii) obtain and maintain a 'satisfactory' U.S. DOT Safety

Rating; provided, however, that if Contractor is providing exclusively intrastate transportation. services hereunder, then it shall be required to maintain only a "satisfactory' state DOT Safety Rating for the involved state" (emphasis added).

54.     The Agreement additionally provides "Covanta reserves the right to have one or more representatives observe the performance of the Services, wherever such Services may be performed, in order to review and approve such Services. Review and approval of such Services by Covanta shall not relieve Contractor of its obligation under this Agreement."

55.     The Agreement also provides that VTC "shall not subcontract the performance of any of the Services to another carrier without the prior written consent of Covanta."

56.     The Agreement also provides that "Transportation routes are subject to Covanta's prior written approval."

57.     Pursuant to a broker-carrier agreement between VTC and the Blue & Green Defendants dated July 12, 2019, the parties represented that the Blue & Green Defendants were "duly authorized to engage in operations in interstate and foreign commerce as a common and/or contract carrier for the transportation of general commodities by U.S. DOT No. 2193362."

58.     On August 26, 2019, the US Department of Transportation revoked the motor carrying authority of the Blue & Green Defendants.

59.     By agreement dated July 12, 2019, defendant TSS leased the Incident Trailer to the Blue & Green Defendants.

60.     The Incident Trailer is a "commercial motor vehicle" within the meaning of the FMCA and FMCR. 49 U.S.C.A. §31132(1), 49 C.F.R. §390.5.

61.     Upon information and belief, defendant TSS had, at the same time, leased the Incident Trailer to VTC.

62.     With respect to the Incident Trailer, TSS was a "lessor" within the meaning of the FMCA and FMCSR, pursuant to 49 C.F.R. §§376.2(f), 376.11, 376.12, 390.5.

63.     With respect to the Incident Tailer, VTC and the Blue & Green Defendants were "lessees" within the meaning of the FMCA and FMCSR, pursuant to 49 C.F.R. §§376.2(f), 376.11, 376.12, 390.5.

64.     Defendant TSS is a "motor carrier" within the meaning of the FMCA and the FMCSR, pursuant to 49 C.F.R. §390.5.

65.     Though defendant TSS has not registered as a motor carrier with the United States Department of Transportation, TSS represented itself to be a motor carrier in the federal annual vehicle inspection reports filed for the Incident Trailer, pursuant to 49 C.F.R. §396.

66.     TSS likewise represented itself to be a motor carrier on the FMCSA Annual Inspection Label affixed to the side of the Incident Trailer.

67.     At the time of the accident and at all relevant times, defendant TSS was an "employer" within the meaning of the FMCA and the FMCSR, pursuant to 49 U.S.C.A. §31132(3), 49 C.F.R. §390.5.

68.     At the time of the accident and at all relevant times, defendant TSS was the statutory employer of Mr. Patten pursuant to the MCA and FMCR, pursuant to 49 U.S.C.A. §31132(2), (3), 49 C.F.R. §390.5 and 49 C.F.R. §§376.2(f), 376.11, 376.12.

69.     As described on VTC's website, "Voyager Trucking Corporation (V.T.C.) and Transfer Trailer Services (T.T.S.) are waste hauling sister companies that specialize in the transportation and brokerage of municipal solid waste, construction, and demolition, biosolids, mulch and recyclables; from transfer stations and manufacturing facilities to landfills and incinerators in the northeast corridor."

70.     VTC, TSS, and TTS share a principal place of business at 451 Frelinghuysen Avenue, Newark, NJ 07114.

71.     Upon information and belief, VTC, TSS and TTS share corporate officers and employees, including Thomas DiDonato, who is the president of VTC and the chief executive officer of TSS and TTS.

72.     As described on VTC's website, "[i]n 2001, Transfer Trailer Services was formed as the foundation of the infrastructure [Mr. DiDonato] envisioned.  In 2012 [Mr. DiDonato] purchased Voyager Trucking Corporation via an equity acquisition. Voyager was a strategic acquisition which allowed access to new markets; an A-901 waste hauling company which is able to move material with its own power."

73.     Upon information and belief, VTC, TSS, and TTS share substantially common ownership and interests.

74.     Upon information and belief, VTC, TSS and TTS share unified administrative control.

75.     VTC, TSS, and TTS have similar and supplementary business functions.

76.     For example, on the accident project, VTC contracted with Covanta to transport waste; VTC then contracted with the Blue & Green Defendants to transport the waste using Blue & Green's tractor; TSS then leased the Incident Trailer, which it owned, both to VTC and to the Blue & Green defendants. The Incident Trailer bears the following identification on the sides of the trailer: "T.T.S.  You call…We haul!"  Adjacent to the T.T.S. identification is the following phone number: 973-589-3444. This phone number is identified on Voyager's website as the phone number for Voyager. When not in use, the Incident Trailer was parked at the defendants' Newark facility along with tractors and trailers owned and operated variously by VTC, TSS, and TTS.

77.     On the VTC website, VTC advertises as follows with respect to its insurance coverage: "Collectively, our companies carry 11 million dollars of insurance and are fully bonded."

78.     The primary auto insurance policy covering this accident, which provides $1 million in coverage, lists the following companies as named insureds: "Transfer Trailer Services Inc., Transfer Station Services Inc., Voyager Trucking Corp, TVD Transport Co., TVD Organics D.B.A.: Voyager Trucking Corp." (emphasis added).

79.     The two excess policies covering the accident, each providing $5 million in coverage, list only TTS specifically as a named insured, although it is believed that the policies cover all the defendants.

80.     Defendant TTS bears enterprise liability for the conduct of its sister corporations VTC and TSS.

81.     Defendants TTS, TSS and VTC are joint venturers and thus defendant TTS is liable for the conduct of its sister corporations/joint venturers VTC and TSS.

82.     At all times relevant hereto, Mr. Patten was employed and/or contracted to perform services for and was operating the tractor trailer for VTC and defendants TSS and TTS under defendants' USDOT and/or motor carrier operating authority and was subject to their supervision, control or right to control, such that defendants were or should be deemed his actual and statutory employer and therefore vicariously liable for Patten's negligence.

83.     At all times relevant hereto, Mr. Patten was the agent, servant, workman, and/or employee of VTC and of defendants TSS and TTS and was acting in the course and scope of his employment, under the direction, control, and authority of defendants.

84.     At all times relevant hereto, VTC and defendants TSS and TTS acted as a single entity and operated and conducted business as a single entity for transporting goods in interstate commerce.

85.     At all times relevant hereto, defendants were engaged in the joint undertaking of a particular transaction for mutual profit, mutual control, mutual contribution, and this joint undertaking was memorialized in a contract.

86.     At all times relevant hereto, VTC and defendants TSS and TTS acted as a joint venture for transporting goods in interstate commerce.

87.     At all times relevant hereto, Kevin J. Patten was employed as a truck driver by VTC and by TSS, TTS, and the Blue & Green Defendants as outlined above.  Alternatively, VTC and defendants TSS and TTS were statutory employers of Mr. Patten.

88.     At the time of the accident, Mr. Patten was operating a commercial motor vehicle in interstate commerce on behalf of VTC, TSS, TTS and the Blue & Green Defendants and under the Motor Carrier Authority of VTC and defendants TSS and TTS.

**The Accident**

89.     This accident took place at a T-intersection formed where southbound Exit 1 from Interstate Highway 176 ("I-176") in Caernarvon Township, Berks County, Pennsylvania terminates into State Highway 10. Route 10 also is commonly known as "Morgantown Road."

90.     For the traffic exiting south from I-176, there is a stop sign at the bottom of the ramp.  There are no stop signs or controls affecting traffic traveling on Route 10.

91.     Traffic travelling on Route 10 has the right of way over traffic on the southbound I-176 exit ramp where Mr. Patten was located.

92.    At the location of the accident, Route 10 travels in an east-west direction, though Route 10 is nominally a north-south road.

93.    On Monday, September 9, 2019, at approximately 5:35 a.m. to 5:40 a.m. (an hour before sunrise which was at 6:35 a.m.), Mr. Sweigart was driving his 2002 Yamaha Fazer 1000cc motorcycle westbound on Route 10 heading toward his work at 836 Peters Road, New Holland, PA. He passed under the I-176 overpass and approached the I-176 offramp.

94.    Mr. Patten had exited the southbound travel lane of I-176 with the intention of turning left onto the eastbound travel lane of Route 10. Mr. Patten was pulling a trailer leased by VTC and used by the company to haul waste.

95.    The tractor-trailer was comprised of a 2006 Freightliner Columbia sleeper cab (NJ Plate: AU647H; VIN 1FUJA6CK46LX11119) and a 48-foot trailer (NJ Trailer Tag No. TRY66W). At its rear, the trailer was supported by two axles and eight wheels, four on either side. Together, the tractor-trailer combination measured 68.5-feet in length.

96.    At the time of the accident, the trailer was carrying municipal waste that had been loaded onto the trailer three days earlier (Friday) at a transfer station in Paterson, New Jersey. The tractor-trailer combination weighed more than 77,000 pounds on the day of the accident.

97.    Mr. Patten intended to offload the waste at Conestoga Landfill, 420 Quarry Road in Morgantown, PA, located off Route 10, just east of the intersection where the accident occurred.

98.    The customer for this delivery was Covanta MacArthur (Fulton), located in Philadelphia, PA.

99.    Although the sides of the trailer did have reflective tape, the tape was covered, at least in part, by residue from municipal waste.

100.    Mr. Patten stated to the investigating police officer that, after leaving I-176, he brought the tractor-trailer to a halt at the stop sign located at the base of Exit 1.

101.    Mr. Patten stated that, looking to his left, he observed the headlight for Mr. Sweigart's motorcycle.  As Mr. Patten recounted to the police, the motorcycle was approaching from his left and when Mr. Patten first saw the motorcycle it was "at the on ramp for the Pennsylvania Turnpike."

102.    At the time he brought his tractor-trailer to a stop, and throughout the course of this accident, Mr. Patten was on a cell phone call with Mr. Patten's cousin -- a fact he did not disclose to the investigating police officer. Talking on the phone while driving was a violation of a VTC safety policy.

103.    Mr. Patten also had his wife in the truck with him. At the time of the accident, Mr. Patten's wife was in the bunk area of the truck participating in the call with Mr. Patten's cousin. Having a family member in the cab of the truck while driving also was a violation of a VTC safety policy.

104.    Even if Mr. Patten's description were correct, a motor vehicle traveling the posted speed limit of 45 mph would close this distance in less time than it would take for Mr. Patten to complete his left turn and clear the rear of his trailer from the oncoming travel lane.

105.    By not waiting a few seconds, Mr. Patten deviated from safe driving practices and created the likelihood of a collision in violation of the Pennsylvania Motor Vehicle Code (75 Pa.C.S.A. §§ 3322 and 3323) and the FMCSRs (49 C.F.R. §§383.110, 383.111, 383.113, and 392.2).

106.    As cautioned in the manual for New Jersey Commercial Drivers:

> Be aware of the size and weight of your vehicle when you cross or enter traffic…. Because of slow acceleration and the space large vehicles require, you may need a

much larger gap to enter traffic than you would in a car. Acceleration varies with the load. Allow more room if your vehicle is heavily loaded. Before you start across a road, make sure you can get all the way across before traffic reaches you.  (NJ CDL Manual, Section 2.7.7)

107.    Pursuant to 49 C.F.R. §§ 383.110, 383.131, the Federal Motor Carrier Safety Regulations required that Mr. Patten possess the skills and knowledge set forth in the NJ CDL Manual.

108.    Mr. Patten told the responding police officer that he believed he "had enough room to pull his tractor-trailer across the roadway."  Mr. Patten thus began to turn left onto Route 10 in front of Mr. Sweigart's approaching motorcycle.

109.    When Mr. Sweigart first saw the tractor nearing the bottom of the exit ramp, he believed that the tractor would stop before entering Mr. Sweigart's travel lane.

110.    The tractor unexpectedly started to pull into Mr. Sweigart's lane.

111.    Mr. Sweigart applied the brakes.

112.    As he slowed, Mr. Sweigart's motorcycle, likely from applying the rear brake, went down on its right side. The momentum rotated the bike in a clockwise direction, leaving Mr. Sweigart on the bike, which was laying on its right side in Mr. Sweigart's travel lane but pointing in the opposite direction.

113.    Mr. Sweigart was not yet injured.

114.    Based on information available to date, Plaintiff believes that the rear of Mr. Sweigart's motorcycle was struck by the rear-wheel tandem on the driver's-side of the trailer. The crushing force of the rear wheels folded the motorcycle seat and frame into Mr. Sweigart's body, shattering his pelvis and causing other catastrophic injuries.

115.    One of the trailer's tires also rolled over Mr. Patten's feet and ankles, crushing them.

116.    Mr. Sweigart blacked out from the pain caused by the crush injuries; he recalls waking up several feet from the motorcycle. Despite his injuries, Mr. Sweigart was able to crawl on his stomach out of his travel lane to the shoulder of the westbound travel lane of Route 10.

117.    Mr. Patten pulled his tractor-trailer onto the shoulder of the eastbound travel lane of Route 10, east of where the accident took place.

118.    At the time of the accident, Mr. Patten had a duty to follow all applicable traffic laws.

119.    Mr. Patten had a statutory duty pursuant to 75 P.S. §§ 3322 and 3323 to yield the right-of-way to any vehicle approaching the intersection which was so close as to constitute a hazard.

120.    Upon information and belief, at the time of the accident, apart from Mr. Sweigart's motorcycle, there were no vehicles travelling in the westbound or eastbound travel lanes of Route 10 and no one behind Mr. Patten on the exit ramp.  There was and is no justification for Mr. Patten deliberately deciding to pull into the right of way of Mr. Sweigart.

121.    As noted above, the accident occurred before sunrise. Mr. Patten thus had an enhanced duty to exercise care.

122.    Pursuant to 49 C.F.R. §§392.7, 392.33, 396.7, 396.11, 396.13, 396.17 and the NJ CDL Manual, Section 2.11.5, part of Mr. Patten's duty in connection with driving a tractor-trailer at night included the obligation to inspect the reflectors on the side of the trailer to ensure that the trailer would be visible to approaching vehicles.

123.    Upon information and belief, at the time of the accident, the reflectors on the side of the trailer were not clean, adversely impacting the conspicuity of the trailer to approaching drivers, including Mr. Sweigart.

124.    Given the circumstances that preceded this accident, Mr. Patten had a duty not to travel into the path of Mr. Sweigart's motorcycle and should instead have simply waited a few seconds for the motorcycle to pass the intersection. Mr. Patten then would have had a clear and unobstructed path to bring his tractor-trailer across Route 10.

125.    Mr. Patten had a duty to drive carefully and defensively to avoid collisions with other vehicles, including Mr. Sweigart's motorcycle.

126.    Mr. Patten likewise had a duty to pay attention to the task of driving and not become distracted.

127.    Mr. Patten breached his duties to Mr. Sweigart.

128.    The collision was not due to any act or failure to act on the part of Mr. Sweigart.

129.    Though defendants advertise their commitment to safety, their driver Kevin Patten violated the Pennsylvania Motor Vehicle Code (specifically sections 3333 and 3323 of the Code relating to driver duties during left turns and at stop signs (75 Pa.C.S.A. §§ 3322 and 3323); FMCSRs (specifically 49 C.F.R. §§ 392.2, 392.3, 392.7, 396.7, 396.11, 396.13, 396.17 392.33, 383.110, 383.111, and 383.113 relating to driver duties for inspections, hours of service, safety skills and knowledge, and compliance with Pennsylvania law); as well as basic safety rules for the operation of a commercial tractor-trailer in causing this accident.

130.    As a direct result of the actions, omissions, or inactions of the Defendants, Plaintiff Travis Sweigart sustained serious and permanent injuries, including, but not limited to, severe crushing injuries to his abdomen, lower back, and pelvis; an open-book pelvic injury with right hip dislocation and acetabular fracture; open fractures along both legs; closed fractures of his lumbar vertebra (L1 through L4) and of multiple ribs on both sides; and lacerations to his anus, kidney, abdominal wall, and lower right quadrant. Mr. Sweigart's right leg had to be amputated

below the knee; because of the severe injuries to and infection of his left leg, he has had limited ability to stand and to walk since the accident and is still at risk to lose the left leg.

131.   As a direct result of the actions, omissions, or inactions of defendants, plaintiff Sweigart's serious and permanent injuries required extended hospitalizations and rehabilitation and will, in the future, require medical and rehabilitation therapy.

132.   As a direct result of the actions, omissions, or inactions of defendants, plaintiff Sweigart has incurred and will in the future incur significant medical expenses for his care and treatment.

133.   As a direct result of the actions, omissions, or inactions of defendants, plaintiff Sweigart has been unable to return to work.

134.   As a direct result of the actions, omissions or inactions of defendants, plaintiff Sweigart has suffered a loss of earnings and in the future will suffer a loss of earning capacity.

135.   As a direct result of the actions, omissions, or inactions of defendants, plaintiff Sweigart has suffered and will in the future suffer pain, mental and emotional anguish, embarrassment, fear, humiliation, frustration, loss of "well-being," and other intangible injuries.

136.   As a direct result of the actions, omissions, or inactions of defendants, plaintiff Sweigart has been prevented from and, in the future, will be prevented from performing his normal activities and is and will be unable to pursue normal and ordinary pleasures of life.

## COUNT I – NEGLIGENCE

**(Direct Liability and Vicarious Liability for the Negligence of Kevin Patten)**
**Travis S. Sweigart v. Defendants Transfer Station Services Inc.,**
**Transfer Trailer Services Inc., Blue & Green Trucking & Hair, LLC,**
**and Kevin J. Patten d/b/a Blue & Green Trucking & Hair, LLC**

137.   Defendants TSS, TTS, and the Blue & Green Defendants knew that appropriate safety training of their drivers (including Mr. Patten) was essential not only to protect the well-

being of their own drivers, but also to protect the well-being of other motorists who would encounter their drivers in the course of their work.

138.   Defendants TSS, TTS, and the Blue & Green Defendants recognized that their failure to exercise reasonable care in the safety training of its drivers increased the risk of harm to motorists encountered by the drivers.

139.   As a corporations and business entities, defendants TSS, TTS, and the Blue & Green Defendants acted through their agents, servants and employees (including Mr. Patten). Defendants TSS, TTS and the Blue & Green Defendants thus bear vicarious liability for the negligent conduct of Mr. Patten that took place during the course and scope of his employment.

140.   Pursuant to the Restatement (Second) of Torts §428, as motor carriers and corporations carrying on activities which can be lawfully carried on only under franchises granted by public authorities (including the USDOT, NJDEP, and PADEP) and which involve an unreasonable risk of harm to others, defendants TSS and TTS are subject to liability for physical harm caused to others by the negligence of a contractor employed to do work in carrying on the activity, including the Blue & Green Defendants and/or Kevin Patten.

141.   With specific reference to defendant TSS, as the owner and lessor of the commercial motor vehicle involved in the accident, TSS is liable for the negligence of contractors (including the Blue & Green Defendants and/or Kevin Patten) acting on behalf of and under the operating authority of TSS, pursuant to 49 C.F.R. §376.2(f), 376.11, 376.12.

142.   Defendants TSS, TTS and the Blue & Green Defendants additionally bear direct liability for the negligent performance of their own safety undertakings and responsibilities.

143.   Defendants' carelessness and negligence consisted of, among other things, the following acts and/or omissions:

a.      Providing inadequate training, guidance and supervision to their agents, servants and employees (including Patten) related to safe operation of commercial vehicles;

b.      Not exercising due care in the selection, hiring, orientation and safety training of their drivers (including Patten);

c.      Failing to have an adequate system or competent individual responsible for ensuring compliance with the regulations promulgated by the Federal Motor Carrier Safety Administration ("FMCSA");

d.      Failing to ensure that Mr. Patten was qualified to drive a Commercial Motor Vehicle in accord with FMCSA regulations 49 C.F.R. §§ 391.21, 391.23, and 391.51;

e.      Failing to instruct their drivers, including Mr. Patten, with respect to their obligations under the FMCSA regulations as required under 49 C.F.R. § 390.3(e);

f.      Failing to ensure that their drivers, including Mr. Patten, observed their obligations under the FMCSA regulations as required under 49 CFR §390.11;

g.      Failing to implement and enforce policies and procedures consistent with FMCSA regulations governing driving and operational safety of commercial motor vehicles including drivers' hours of service, vehicle inspection, repair and maintenance; and safety skill and knowledge as required under 49 C.F.R. §§ 392.2, 392.3, 392.7, 392.33, 395.1, 395.3, 396.3, 396.7, 396.9, 396.11, 396.13, 396.17, 383.110, 383.111, and 383.113;

h.      In light of the significant danger created by the transporting of extremely heavy loads by over-the-road tractor-trailers, failing to exercise due care;

i.      Failing to create a defined safety standard for the performance of their tractor-trailer drivers;

j.      Inadequately instructing their tractor-trailer drivers on the specific dangers associated with left-hand turns;

k.      Inadequately instructing their tractor-trailer drivers on right-of-way procedures;

l.      Inadequately instructing their tractor-trailer drivers on the specific dangers associated with moving into the right of way of a motorcycle;

m.      Inadequately instructing their tractor-trailer drivers on the specific dangers associated with driving at night;

n.      Failing to monitor and enforce their cell phone policies with respect to Mr. Patten;

o.      Permitting and entrusting Mr. Patten to operate the tractor-trailer after it knew or should have known that his motor carrying authority had been revoked by the USDOT, in violation of both the Master Transportation Agreement and FMCSA regulations 49 C.F.R. §§ 383.37(b), 391.11(b)(7), and 391.15(b); and,

p       Permitting and entrusting Mr. Patten to operate the tractor-trailer after it knew or should have known that he was not qualified to operate the tractor-trailer.

144.    As a direct and proximate result of the negligence of TSS, TTS and the Blue & Green Defendants, their agents, servants, employees, and independent contractors (including Patten), plaintiff Travis Sweigart sustained serious injuries and damages as outlined previously in the Complaint.

WHEREFORE, Plaintiff Travis Sweigart demands of the Defendants, jointly and severally, compensatory damages in excess of Seventy-Five Thousand ($75,000.00) Dollars together with delay damages, interest, costs of suit and such other relief that the Court deems just.

## COUNT II – NEGLIGENT SELECTION

### Travis S. Sweigart v. Covanta

145.    Plaintiff realleges and incorporates by reference every preceding paragraph as though set forth fully at length.

146.    Defendant Covanta employed VTC as an independent contractor under the terms and agreements set forth in the aforesaid Master Services Agreement.

147.    Pursuant to Restatement (Second) of Torts § 411 (1965), Covanta owed a duty to third persons, including plaintiff, Travis Sweigart, to exercise reasonable care to employ competent and careful motor carriers driving tractor trailers hauling tons of municipal waste from its transfer stations to interstate destinations, work that involves a risk to the driving public unless it is skillfully and carefully done.

148.   Covanta was negligent in the following respects:

a. In light of the significant danger created by the transporting of extremely heavy loads by over-the-road tractor-trailers, failing to check the safety record of VTC to determine its skill and experience before selecting it as a motor carrier and entering into the Master Services Agreement;

b. Selecting VTC as a motor carrier transporting extremely heavy loads by over-the-road tractor-trailers when it knew or should have known that VTC had a record of significant safety violations;

c. Selecting VTC without implementing or enforcing policies and procedures, that establish safety requirements its contractors, including VTC, are required to following to assure that the drivers it hires, subcontracts, or employs to haul municipal waste for Covanta, including Kevin J. Patten, are skilled and experienced;

d. Selecting and continuing to engage the services of VTC without enforcing the provision of the Master Services Agreement requiring VTC to obtain Covanta's prior written consent when subcontracting any of the Services to another carrier, thereby avoiding its responsibility to assure only skilled and experienced motor carriers were selected to perform the services subject to the Master Services Agreement; and,

e. Selecting and continuing to engage VTC when it knew or should have known that VTC had a pattern or practice of subcontracting to other carriers without its consent in violation of the express terms of the Master Services Agreement

149.   Covanta was negligent in its selection of VTC.

150.   Defendant Covanta negligently selected VTC and in turn, VTC failed to exercise reasonable care in the performance of its contractual undertaking with Covanta (as described more fully above and in the Companion Complaint), resulting in physical harm to Mr. Sweigart.

151.   Alternatively, if Covanta was apprised of VTC's decision to select defendants Blue and Green and Patten under the Master Services Agreement, and authorized that decision, Covanta failed to exercise reasonable care in its approval.

152.    Defendant is liable to plaintiff, Travis Sweigart for its negligent selection of VTC and or its negligent approval of Blue and Green and Patton pursuant to the Restatement (Second) of Torts § 411(1965).

WHEREFORE, Plaintiff Travis Sweigart demands of the Defendant Covanta, jointly and severally, compensatory damages in excess of Seventy-Five Thousand ($75,000.00) Dollars together with delay damages, interest, costs of suit and such other relief that the Court deems just.

RAYNES LAWN HEHMEYER

BY: _____
Mark J. LeWinter, Esquire (PA ID #36336)
Charles P. Hehmeyer, Esquire (PA ID #48167)
Martina W. McLaughlin, Esquire (PA ID #33135)
Daniel Bencivenga, Esquire (PA ID #74198)
1845 Walnut Street
20th Floor
Philadelphia, PA 19103
Phone:  (215) 568-6190
Facsimile:  (215) 988-0618
Email: mjlewinter@rayneslaw.com
        cph@rayneslaw.com
        mwmclaughlin@rayneslaw.com
        dbencivenga@rayneslaw.com

Date: September 1, 2021